IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHERYL WATSON ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 14CV4990 |
| v. ) | Judge Ellis |
| ) | Magistrate Judge Mason |
| RELIANCE STANDARD LIFE ) | |
| INSURANCE COMPANY ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT**

**INTRODUCTION**

Plaintiff, Cheryl Watson ("Plaintiff" or "Watson"), filed this action seeking long-term disability ("LTD") benefits due under the Hektoen Institute, L.L.C. Group Long Term Disability Insurance plan (the "Plan"), an employee welfare benefit plan sponsored and maintained by Hektoen Institute, L.L.C. Benefits due under the plan are provided under an insurance policy issued by Reliance Standard Life Insurance Company ("Defendant" or "Reliance Standard") pursuant to the terms of Group Policy Number LTD 111747 (the "Policy"). The Plan and the Plaintiff's claim are both governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et. seq*. ("ERISA").

For the reasons set forth below, this Court should grant Plaintiff's Motion for Entry of Judgment and deny Defendant's Motion for Entry of Judgment. Although Ms. Watson's diagnosis remains undetermined, multiple physical, psychiatric, and neurological examination findings unequivocally demonstrate that her well-established fatigue, pain, headaches, numbness, vision disturbances, depression, anxiety, and other cognitive, psychological, and neurological

symptoms have and continue to cause restrictions and limitations that render her totally disabled. Plaintiff's symptoms and examination findings have been objectively corroborated through a series of tests, including multiple brain MRIs, a sleep study, evoked visual response testing, a psychological evaluation, and countless physical examinations. Throughout the many years that Ms. Watson has sought treatment for her symptoms, not one of her physicians has questioned the authenticity of her reported symptoms. Rather, each physician cited Plaintiff's test findings as evidence that *something* abnormal is present.

Despite initially accepting Ms. Watson's self-reports and approving payment of short-term disability benefits under a nearly identical disability standard, Reliance Standard now inexplicably asserts, without citing any evidence to explain a change in its position, that Plaintiff had "no change in [her] chronic condition at the date [she] ceased working, March 11, 2013." That inconsistency demonstrates the error of Reliance Standard's denial of Plaintiff's LTD benefits, which was based on snippets cherry-picked from the medical evidence. Throughout the claim process, Reliance Standard failed to consider the material duties of Ms. Watson's position and utilized non-existent vocational standards in failing to address the impact of Ms. Watson's severe symptoms on her ability to perform her regular work. Consequently, the Court must enter judgment in Plaintiff's favor for the reasons set forth below.

## STATEMENT OF FACTS

Although Plaintiff has filed a separate document enumerating the critical facts,[1] she highlights the most significant facts below.

    A.    **Plaintiff's Relevant Medical History and Claim Chronology**

Ms. Watson, age 56, was last employed as research study coordinator at Hektoen Institute, an affiliate of the University of Illinois Medical District. (Pl.'s Statement of Facts

---

[1] Although Local Rule 56.1 is not applicable, Plaintiff's briefing is modeled after the requirements of that Rule.

("PSF") ¶ 8). While still working in 2007, she began to experience a marked decline in her ability to perform her material job duties due to significant fatigue, muscle weakness, and intermittent numbness and tingling in her extremities. (PSF ¶¶ 12-7). After multiple MRIs showed abnormalities within the deep white matter of the brain, Ms. Watson's treating neurologists opined that symptoms may be related to demyelinating disease. (PSF ¶¶ 12; 14).

Ms. Watson's symptoms continued to worsen over the next several years. By 2010, she was additionally suffering from brain fog, forgetfulness, difficulty retrieving words, an inability to concentrate, joint pain, intermittent stiffness of the hands and shoulder, interrupted sleep, intermittent numbness, and continuing fatigue despite treatment with Provigil. (PSF ¶¶ 14-8). By 2012, Ms. Watson reported more fatigue within a few hours of waking, causing diminished work performance and missed time at work, difficulty with memory and concentration, word finding difficulty, pain in her right lower back radiating to both legs, and an increase in the frequency and severity of her headaches. (PSF ¶ 20). At that time, she sought a second opinion from the Mayo Clinic, after which her doctors opined that "multiple sclerosis remains a possibility" but that she could not be definitively diagnosed. (PSF ¶ 21-2). On March 11, 2013, Ms. Watson's treating doctors provided certification that she was no longer capable of working; and she has not worked in any capacity since that date. (PSF ¶¶ 22; 36).

After ceasing work, Ms. Watson has continued to undergo treatment for significant neurological symptoms while also beginning treatment for "severe" depression and anxiety. (PSF ¶¶ 23-34). She has undergone updated brain MRIs, visual evoked response testing, and, because of several unexplained episodes of right eye "vision darkening," visual field examination testing. (PSF ¶¶ 32-5). Due to abnormal findings on those objective tests, Ms. Watson's treating physicians continue to opine that she may be suffering from a demyelinating

3

disease such as multiple sclerosis, although that diagnosis cannot be confirmed due to the absence of changes in the brain lesion thus far. (PSF ¶ 35). Yet despite the lack of a definitive diagnosis, none of Ms. Watson's treating physicians have ever questioned the existence or severity of her symptoms; and each physician now agrees that the abnormal findings on examination are in some way related to those symptoms. (PSF ¶¶ 20-2; 24; 27-31; 33-5).

Due to the ongoing severity of her symptoms, Ms. Watson applied to Reliance Standard for short-term disability benefits shortly after leaving work; and following approval and exhaustion of that claim, timely filed for LTD benefits. (PSF ¶¶ 36-7). Despite its previous award of benefits, however, Reliance Standard denied Ms. Watson's claim for LTD benefits. (PSF ¶ 42). Failing to consider the explicit policy language judging disability based on whether she could perform her cognitively demanding occupation, Reliance Standard relied upon an internal nurse's review to conclude that the combination of her many symptoms did not establish her disability from performing generic "sedentary" work. (PSF ¶¶ 41-2). Ms. Watson challenged that decision upon appeal, arguing that her symptoms were well established by the medical evidence and disputing Reliance Standard's failure to consider any of her non-exertional job duties. (PSF ¶¶ 44-5). Ms. Watson included with her appeal over 200 pages of additional medical records that Reliance Standard did not consider, as well as abnormal test results from a brain MRI taken April 21, 2014. (PSF ¶¶ 45; 47).

Despite both the policy requirements and its fiduciary duty under ERISA (29 U.S.C. § 1104(a)(1)) that the Supreme Court has characterized as necessitating the application of "higher-than-marketplace quality standards,"[2] Reliance Standard upheld its decision to deny benefits. Again, Reliance Standard did not assess Plaintiff's ability to perform her "regular occupation." Instead, the claim was assessed strictly within the context of her ability to perform the physical

---

[2] *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 115 (2008)

demands of generic sedentary work. Defendant also disregarded multiple impairing symptoms that are well-documented throughout the record. (PSF ¶¶ 48-9; 51). The second denial decision also relied upon a non-examining doctor's rejection of the severity of Ms. Watson's neurological symptoms, stating that her complaints were "subjective" and not supported by objective evidence despite MRI and other objective test abnormalities. (PSF ¶ 51). Following the issuance of that decision, Ms. Watson's claim appeals were exhausted, precipitating this action. (PSF ¶ 52).

## ARGUMENT

On January 28, 2015, this Court determined that the standard of review in this case is *de novo*. (Docket No. 24, Transcript (attached as Ex. A). Under the *de novo* standard, the U.S. Court of Appeals for the Seventh Circuit has instructed that ERISA litigation "should be conducted just like contract litigation, for the plan and any insurance policy are contracts." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d. 841, 843 (7th Cir. 2009). *Krolnik* emphasized that under the *de novo* standard, in contrast to the ERISA arbitrary and capricious standard of review, the court is rendering an independent decision as to whether benefits are due, rather than reviewing a record to assess the reasonableness of a benefit determination. *See also Ehas v. Life Ins. Co. of N. Am.*, 2012 WL 5989215 (N.D. Ill. Nov. 29, 2012) ("Put differently, *de novo* review requires courts to make an 'independent decision' analogous to deciding 'how the language of [a] contract applies to [the] facts.'") (citing *Krolnik*, 570 F.3d. at 843). The parties have agreed that in lieu of a bench trial, they are submitting cross-motions for judgment along with the relevant records and medical reports so that the court can weigh the evidence presented and conduct a trial on the papers. *See, Baxter v. Sun Life,* 833 F.Supp.2d 833, 835 (N.D. Ill. May 20, 2011).

### I. Reliance Standard's Decision to Deny LTD Benefits was Unsupported by the Medical and Vocational Evidence

Where a disability insurer terminates benefits subsequent to its initial agreement to

5

approve a claim, the prior claim decision must be considered among other factors in determining the propriety of such action. *See Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 777 (7th Cir. 2010); *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009). Once a claimant "has offered sufficient evidence to establish continuing disability under the plan[,]" an insurer must "support its contrary conclusions with sound 'reasoning in the record.'" *Holmstrom,* 615 F.3d at 776-77 (citing *Leger,* 557 F.3d at 835). Any rejection of established medical evidence or opinion, based either upon selective readings of the evidence or "cherry-picked" statements from the medical history, is the "hallmark of an arbitrary and capricious decision." *Holmstrom,* 615 F.3d at 777 (citing *Majeski v. Metropolitan Life Ins. Co.,* 590 F.3d 478, 483-84 (7th Cir. 2009); *Leger,* 557 F.3d at 832-33).

Given Defendant's initial finding that Ms. Watson was totally disabled under the terms of the short-term disability plan, Reliance Standard's subsequent contrary finding, made in the face of substantial evidence that Plaintiff's symptoms persisted and remained uncontrolled, was simply wrong. Moreover, Defendant adjudicated the claim without taking into consideration the material duties of Ms. Watson's own occupation, resulting in a perversion of the policy language that essentially creates a *de facto* "any occupation" disability standard. And it further rejects out-of-hand Ms. Watson's statements establishing the frequency and severity of her symptoms, punishing her because her neurological illness has not conclusively diagnosed despite the abnormalities found on objective testing. Such disregard for the governing policy requirements is indicative of Reliance Standard's breach of contract, if not arbitrary decision-making, and compel this Court to reverse Ms. Watson's claim denial.

### A. Defendant Ignored the Non-exertional Demands of Plaintiff's Occupation

As the Policy plainly states that Ms. Watson is disabled if she "cannot perform the

material duties of [her] regular occupation," a proper disability determination requires Reliance Standard to "develop a clear understanding of the insured's occupation at the time [she] became disabled [and], [o]nce the job functions are defined, [to] determine what functions the insured is unable to perform and the significance of that inability to the overall job function." *Stender v. Provident Life and Accident Ins.* Co., 98 C 1056, 2000 WL 875919 (N.D. Ill. 2000). Reliance Standard's denial explanations, however, are devoid of any such analysis.

> In its initial LTD denial letter, Defendant states:
>
> A Vocational Rehabilitation Specialist has reviewed and considered all relevant information in your claim file and determined that your occupation is classified as Sedentary. Your claim for benefits has been evaluated based on your ability to perform a Sedentary occupation . . .

However, the policy's occupational disability standard requires more than an assessment of exertional capacity; Reliance Standard cannot ignore the mental demands of Plaintiff's occupation. Yet when Plaintiff alerted Defendant to its failure to assess the non-physical aspects of Watson's occupation, Reliance Standard falsely maintained that it gave that issue "careful consideration." In reality, the peer review doctor was never provided with Ms. Watson's job description; the consultant was only asked to give an opinion as to whether Plaintiff could perform sedentary work.

Reliance Standard's failure to consider Ms. Watson's actual job duties is a familiar theme with that insurer; and its behavior significantly prejudices its claim decision here. First, although some LTD policies may indeed define "regular occupation" as how the occupation typically exists in the general labor market rather than how it is specifically performed by the insured, the policy at issue here does not contain any such language. Confronting identical policy language and a similar attempt by Reliance Standard to create inappropriate limitations, the U.S. Court of Appeals for the Third Circuit held in *Lasser v. Reliance Standard Life Ins. Co.*:

7

> The Policy states that it protects the insured from inability to 'perform the material duties of his/her regular occupation.' Both the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability. Applying the text as written, Dr. Lasser's regular occupation was as an orthopedic surgeon responsible for emergency surgery and on-call duties in a relatively small practice group and within a reasonable travel distance from his home in New Jersey. . . .

344 F.3d 381, 385-86 (3d Cir. 2003); *accord Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252-53 (2d Cir. 1999) (actual job duties need to be assessed); *Ebert v. Reliance Standard Life Ins. Co.,* 171 F. Supp. 2d 726, 735 (S.D. Ohio 2001) (criticizing Reliance's utilization of a generic occupation).

Second, Reliance Standard's designation of Ms. Watson's position as "sedentary"[3] and its blatant disregard of its obligation to assess the insured's occupational abilities conflates the "own occupation" definition of disability into a *de facto* "any occupation" standard. By taking the approach that it need only consider the "sedentary demands" of an occupation, Reliance Standard impermissibly disregarded the extensive cognitive and interpersonal requirements of Plaintiff's occupation and thus deviated from the policy requirements. As *Ravesloot v. Admin. Comm. of Baxter Int'l, Inc.*, No. 03-8564, 2004 WL 1427101 (N.D. Ill. June 24, 2004) teaches, when a plan administrator denies a claim for benefits because it alleges that the claimant is capable of performing a specific occupation, that decision is improper when it fails to address whether a claimant can perform their specific occupation. *See also Small v. First Reliance Standard Life Insur.Co.,* 2005 U.S.Dist.LEXIS 3153 (E.D. Pa. Feb. 28, 2005); *Rohr v. Designed Telecomms., Inc.*, No. 08-345, 2009 WL 891739 *11 (S.D. Ohio Mar. 30, 2009) (court held that "[b]y evaluating only the physical requirements of Plaintiff's employment position, Jefferson Pilot

---

[3] The term "sedentary" classifies work according to physical exertion only and in no way accounts for non-exertional job demands, such as accuracy, timeliness, productivity, mental stamina, stress-related endurance, or memory skills. *See* 20 C.F.R. § 404.1567(a) (1997). Also see Dictionary of Occupational Titles, App. C (4th ed. 1991).

ignored the most significant aspects of Plaintiff's job, i.e., the intellectual and/or mental functions," and determined that such conduct was arbitrary); *Rabuck v. Hartford Life & Accident Ins. Co.*, 522 F.Supp.2d 844 (W.D. Mich. 2007) (same). The record shows that Reliance Standard completely disregarded the policy requirement that it assess Plaintiff's specific occupation.

A proper evaluation of Ms. Watson's claim required Reliance Standard to consider *all* of the material duties listed in her job description, paying particular attention to the non-exertional duties. *See Ebert*, 171 F. Supp. 2d at 735 (Finding that because "regular occupation" was not defined by the policy and an actual job description was provided by the employer, Reliance Standard was obligated to consider the job duties as detailed in the job description and could not rely upon a "similar [Dictionary of Occupational Titles]-specified occupation."). The job description shows that Ms. Watson, in her role as a mental health research study coordinator, was required to routinely conduct research interviews of individuals within a research study's behavioral health research scope, provide primary referrals for study participants who report specific treatment needs, train research staff to ensure compliance with internal protocols, complete and submit regulatory documents and study procedures, create and supervise study incentive programs and manage transportation and child care programs for study participants, and maintain and track recruitment, referral, enrollment, and study activities. The position required "excellent interpersonal skills" and incorporated a near constant need to synthesize and analyze information, concentrate, pay close attention to detail, problem-solve, stay on task, read, research, and use a computer. (PSF ¶¶ 8-10).

Moreover, given the nature of behavioral health research and the medical research field at large, the position carried a small margin of error, necessitated compliance with strict deadlines,

9

and placed a high level of stress on Ms. Watson. Reliance Standard is obligated to consider such factors, but failed to do so when it evaluated Plaintiff's LTD claim. *See*, *e.g.*, *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emples.*, 741 F. 3d 686, 701 (6th Cir. 2014) (a treating psychiatrist's opinion that Plaintiff had "substantial impairment in [his] ability to sustain the stress and pressure of day-to-day work" contributed to a finding that he "could not 'perform[] timely and quality work' or deliver 'any commercial grade work[,]'" two material duties); *Hoover v. Provident Life and Accident Insur. Co.,* 290 F.3d 801 (6th Cir. 2002) (holding that an insurer must consider the stress of the claimant's occupation when stress would directly affect the claimant's medical condition). And based on the need to meet such deadlines and perform within a team-like setting in coordination with outside parties, the position certainly allows for little to no tolerance for frequent breaks or unscheduled adjustments to a work-day to accommodate medical symptoms. *See Hillock v. Continental Cas. Co.,* 2004 WL 434217 (N.D. Ill. March 2, 2014) (rejecting an argument that the claimant could sit or stand at will, finding that many of the claimant's tasks were "time-dependent and cannot be put off to a time when a person is feeling better."). Because Plaintiff's medical condition, as shown below, causes Plaintiff's inability to perform nearly all of these non-exertional job duties, the failure to consider *any* of them no doubt falls well below the required "full and fair" review standard.

### B. Plaintiff Cannot Perform Multiple Material Duties of her Regular Occupation

When all of the material duties of Ms. Watson's position are fairly considered, the medical records establish that she is unable to perform all of her job duties on a full-time basis. *See McFarland v. Gen. Am. Life Ins. Co.,* 149 F.3d 583, 586 (7th Cir.1998) (Plaintiff need only show "that [she] is unable to perform *any one or more* of the substantial or material acts of his occupation in his usual and customary manner" to prove disability). Ms. Watson has

consistently reported throughout the time period at issue that she is exhausted to the brink of collapse; that her pain is constant and unresponsive to medication; that she experiences headaches, numbness, visual disturbances, and other unexplained neurological symptoms; and that she suffers from psychiatric illness related to her ongoing medical issues. Those claimed symptoms are corroborated not only by the results of MRI, sleep study, sensory response tests, and other objective testing, but also by the examinations and treatment plans made by no fewer than five doctors and a clinical therapist. *See Holmstrom*, 615 F.3d at 776-777 (criticizing insurer's disregard of consistent history offering corroborative support for subjective complaints); *Diaz,* 499 F.3d at 645 ("Diaz's testimony cannot be discounted simply because it is 'self-serving' or because it is not 'medical' or 'neurological' evidence."); *Krupp v. Liberty Life Assurance Company of Boston,* 936 F. Supp. 2d 908, 918 (N.D. Ill. Mar. 25, 2013) (Evidence of subjective symptoms cannot be discounted when they are established through objective testing and examination). Although Plaintiff's diagnosis has not been definitively establsihed, it is without question that Ms. Watson suffers the symptoms of multiple sclerosis-like neurological disorders that federal courts routinely find disabling.

First, Ms. Watson's fatigue (and possibly related sleep disorder) causes near constant interference with her ability to perform high-level cognitive thinking and interpersonal communication. She reports being unable to concentrate and complete tasks throughout the day, had significant problems with word-finding, memory, and cognitions, and was making "many mistakes at work." (PSF ¶¶ 19-20, 22-3, 28-9). Nonetheless, Reliance Standard dismissed reports of Ms. Watson's fatigue as "not related" to her brain lesion, inexplicably denying the authenticity of her fatigue because its cause could not be readily ascertained.

As the reported symptoms themselves remain unquestioned throughout the record,

11

Reliance Standard is not free to ignore Plaintiff's symptoms simply because they are "self-reported" or without a clear etiology. *See Sexton v. Deloitte & Touche LTD Plan,* 2003 U.S.Dist.LEXIS 5185 at *10 (D. Minn. March 27, 2003) (faulting the administrator for failing to consider MS-related fatigue, which the claimant made a "primary, if not overriding, issue."); *see also Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (court explained that although certain medical conditions can be objectively diagnosed, the level of pain or fatigue that such conditions produce cannot be, and just because the level of pain experienced as a result of those conditions is subjective, that does not mean they are not totally disabling).

Similarly, constant pain also renders Ms. Watson unable to consistently perform the high-level cognitive demands without losing focus or needing to take breaks. By 2013, she is reporting that low back and bilateral leg pain was "like a vice-grip" that made her incapable of performing even basic activities of daily living. (PSF ¶ 28). Objective examination revealed that this pain was shown to be "consistent with lumbar neuropathy at [the] S1 level ([as evidenced by] decreased ankle jerk & lateral forefront sensation." (PSF ¶ 29). The Seventh Circuit and courts within this district have made it clear that pain is a significant factor that affects employability; as it has ruled regarding fatigue, the appellate court has held that consistent and unchallenged reports of pain cannot be ignored by a claims administrator and that corroboration of pain complaints through examination, treatment history, and objective testing justifies entitlement to disability benefits. *See Diaz,* 499 F.3d at 645; *Holmstrom,* 615 F.3d at 758; *Hawkins*, 326 F.3d at 918.

The same requirements remain true with Ms. Watson's other neurological symptoms, including her headaches, weakness, transient numbness, episodes of blacked-out vision, as well

as her psychiatric symptoms. Reliance Standard must consider each symptom in conjunction with both the actual material duties of Ms. Watson's job and the totality of all of her combined symptoms. *See Curtis v. Hartford Life & Accident Ins. Co.,* 2014 WL 4185233, at \*13 (N.D. Ill. Aug. 20, 2014 (an insurer is not permitted to evaluate the restrictions caused by separate impairments in an incomplete, piecemeal fashion); *see also Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 809 (10th Cir. 2004) ("Fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory"). Plaintiff's symptoms, while perhaps not independently disabling, cause additional restrictions and limitations that further inhibit her ability to work.

Lastly, Reliance Standard cannot ignore or downplay the severity of Ms. Watson's symptoms simply because she lacks a concrete diagnosis. Multiple courts have ruled that when a claimant presents debilitating symptoms of a condition, verified through examination and the opinion of treating physicians, the lack of a clinical diagnosis is not grounds to deny benefits. For example, in *Gaylor v. John Hancock Mut. Life Ins. Co*., 112 F. 3d 460 (10th Cir. 1997), the United States Court of Appeals for the Tenth Circuit summarized the plaintiff's claim as follows:

> These doctors did not use a crystal ball to conclude that Ms. Gaylor was disabled; their opinions were based on clinical physical examinations. The verification requirement must be treated as evidentiary in nature. Medicine is, at best, an inexact science, and we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings either are not yet within the state of the art, or are inconclusive.

*Id*. at 467; *accord Al-Abbas v. Metro.Life Ins.Co.,* 2014 WL 5151405 (D. Mass. September 30, 2014) (criticizing insurer for denying claim due to absence of precise diagnosis)

### II.     Plaintiff Meets the Policy's Definition of Disabled

In the recently decided case of *Cheney v. Standard Ins. Co*., 2014 U.S. Dist. LEXIS

13

120043, *25-6, *35 (N.D. Ill. August 28, 2014), the Court applied *McFarland*, 149 F.3d at 588, to explain that such policy language encompasses both "qualitative" and "quantitative" reductions in a person's performance as a result of an injury or sickness, and noted that consideration of both factors represents the "crux of the case." In *McFarland*, the Court defined "qualitative reductions," as referring to the inability of a person to perform "one core and essential aspect" of one's job – for example, a baseball shortstop losing the ability to throw. 149 F.3d. at 588. The court added that loss of the ability to perform an essential duty of one's job would result in disability "even if, in percentage terms, the disability affected an essential duty that comprised, for example, only 5% of the person's overall duties." *Id.; see also Seitz v. Metropolitan Life Ins. Co.*, 433 F. 3d 647, 651 (8th Cir. 2006) ("When a Plan uses an individual's own occupation to determine whether he or she is totally disabled, being able to perform some job duties is insufficient to deny benefits."). A "quantitative reduction" in work performance, in contrast, occurs when an injury or sickness does not "physically prevent an employee form performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation." *Id.* Thus, under an even more restrictive disability definition as the instant case, *Cheney* explains that "[a] fair reading of the policy language . . . supports the view that to be considered disabled, plaintiff must be unable to perform only a single material duty of her occupation." U.S. Dist. LEXIS 120043 at *26-7.[4]

Therefore, if this Court finds that Ms. Watson is precluded from performing even one of her material job duties on a full-time basis, a finding of eligibility for LTD benefits is compelled. The reality, however, is that this case is not even a close call – severe fatigue, constant pain,

---

[4] The LTD Policy at issue in *Cheney* included language permitting consideration of an own occupation "as it is performed in the national economy." As explained above, the policy here, like in *McFarland*, does not contain such a restrictive interpretation of "own occupation."

14

cognitive impairments, and frequent headaches impact the ability to do nearly any imaginable job duty, and residual numbness, transient dizziness and vision loss, and psychiatric symptoms would certainly cause further interference with both her technical and interpersonal job requirements. The fact that Ms. Watson's position required heightened levels of attention, concentration, accuracy, timeliness, problem-solving, analytical thinking, and decision-making further evidences the absurdity of simply classifying her position as "sedentary" and certainly presents compelling evidence that Ms. Watson has established both qualitative and quantitative limitations on her ability to perform her regular occupation.

## CONCLUSION

Reliance Standard failed to thoroughly evaluate Plaintiff's claim and ignored key Policy provisions in its termination of LTD benefits. Based upon the substantial evidence contained in the record that supports the arguments advanced in this memorandum, judgment must be entered in favor of Ms. Watson awarding her all benefits due, along with prejudgment interest, costs, and attorneys' fees pursuant to 29 U.S.C. § 1132(g).

Dated: April 10, 2015                                          Respectfully Submitted,

                                                               /s/ *Mark D. DeBofsky*_____
                                                               Attorney for Plaintiff

Mark D. DeBofsky
William T. Reynolds
DeBofsky & Associates, P.C.
200 West Madison Street, Suite 2670
Chicago, Illinois 60606
Voice (312) 561-4040
Fax (312) 929-0309
mdebofsky@debofsky.com
wreynolds@debofsky.com

15

## **CERTIFICATE OF SERVICE**

Mark D. DeBofsky, the undersigned attorney, certifies that he served a copy of the foregoing upon the Clerk of Court and all counsel of record by CM/ECF, on April 10, 2015.

/s/ *Mark D. DeBofsky*

Mark D. DeBofsky
Attorney for Plaintiff