# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 4990 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Cheryl Watson worked as a research study coordinator at the Hektoen Institute
("Hektoen"), through which she obtained long-term disability insurance from Defendant
Reliance Standard Life Insurance Company ("Reliance Standard").  In March 2013, after
complaining to her doctors for a number of years of depression, fatigue, cognitive issues, and
pain, Watson took a leave of absence from and then left her job.  Watson sought long-term
disability benefits from Reliance Standard, but Reliance Standard denied her claim based on its
finding that Watson was not disabled under the policy.  Watson then brought this suit
challenging Reliance Standard's denial of her claim under Section 502(a)(1)(B) of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.  In June 2015, the Court
remanded the case to the claims administrator to conduct additional examinations and
proceedings.  Upon further review of her claim, Reliance Standard granted Watson benefits
under the plan's twenty-four month mental or nervous disorder limitation, terminating benefits as
of June 10, 2015.  Watson now returns to the Court seeking all long-term disability benefits
allegedly due from June 10, 2015 through the present and beyond, pre-judgment interest, costs,
and attorneys' fees.  The parties have agreed to proceed with a trial on the papers in accordance

with Federal Rule of Civil Procedure 52, and the Court heard oral argument on September 5, 2017. *See, e.g.*, *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (trial on the papers is an appropriate procedure for resolving ERISA disputes); *Baxter v. Sun Life Assurance Co. of Canada*, 833 F. Supp. 2d 833, 835 (N.D. Ill. 2011) (court would conduct "paper trial in which the Court reviews the record, and, in accordance with Rule 52 of the Federal Rules of Civil Procedure, enters findings of fact and conclusions of law"). Having considered all the evidence in the record, the Court finds that the preponderance of the evidence demonstrates that Watson remains totally disabled due to her physical limitations and thus entitled to continued long-term disability benefits.

## FACTS[1]

### I. Watson's Medical History

Watson, born in 1959, has a master's degree from the University of Chicago and is a licensed clinical social worker. She worked at Hektoen as the WIHS/MACS Neuropsych & Mental Health Study Coordinator from 2002 until March 31, 2013. In this position, she was responsible for coordinating various mental health, behavioral, and neuropsychiatric substudies. Watson's job responsibilities included, among others, submitting regulatory documents and annual progress reports, designing and implementing study procedures, identifying study participants, scheduling participants for study visits and providing study incentives, training research staff, maintaining study tracking databases, ensuring high quality data collection, and conducting research interviews.

---

[1] The facts in this section are derived from the parties' statements of fact in connection with the current motion for judgment and Watson's initial motion for judgment and from the administrative record and the supplemental administrative record. References to AR are to the administrative record previously filed at Doc. 16. References to SAR are to the supplemental administrative record filed at Doc. 75. Rule 52 requires the Court to enter findings of fact and conclusions of law. To the extent any finding of fact is more properly characterized as a conclusion of law, or vice versa, it should be so construed. *See Baxter*, 833 F. Supp. 2d at 835 n.2.

In late 2007, Watson began complaining to her doctors of fatigue and numbness. On November 4, 2007, she underwent a brain MRI, which showed mild scattered signal abnormality within deep white matter. Watson also had an MRI of her cervical spine on November 6, which revealed a small central disc herniation with mild central spinal stenosis. On November 19, a visual evoked response test rendered an abnormal visual evoked response, noted as consistent with a demyelinating process. On December 6, Watson had a lumbar puncture, with normal results. On December 31, Watson saw Dr. Afif Hentati, a neurologist, who concluded that Watson was suffering from "[n]umbness of unknown cause" and suggested that she might have either small vessel disease or demyelinating disease. AR 495. When Watson returned to Dr. Hentati in May 2008, complaining of "more pronounced muscle weakness," "profound fatigue," "[b]rain fog forgetfulness, difficulty retrieving words, and lack of concentration," Dr. Hentati's impression was that Watson was suffering from "[f]atigue and numbness," with "a definite element of sleep disturbance and possibly sleep apnea." AR 492–93. Dr. Hentati referred Watson for a sleep evaluation. A July 9 polysomnogram showed approximately 33.5 arousals per hour of unknown cause but was otherwise "[e]ssentially normal." AR 563.

Over the next year, Watson continued complaining to her doctors of chest pressure, foot pain, and sinus congestion, among other issues. On June 18, 2010, when she saw Dr. Hentati, Watson complained of fatigue, joint pain, forgetfulness, difficulty concentrating, and tingling in her legs. Watson admitted she felt stable overall however, and Dr. Hentati's examination returned normal physical and neurological results. Watson returned to Dr. Hentati on October 17, with Dr. Hentati noting that her evening and variable work schedule qualified her for shift work sleep disorder. In November, Watson also began complaining of neck pain, for which she

received a muscle relaxant.  A year later, in November 2011, Watson complained of lower back pain, which she aggravated when planting spring bulbs, and was prescribed a painkiller.

In December 2011, Watson complained to her primary care physician, Dr. Rhonda Stein, of chronic fatigue and waking up several times throughout the night.  Watson returned to Dr. Hentati on February 13, 2012, also complaining of fatigue, lack of energy, and difficulty sleeping.  On June 22, she had another brain MRI, which again showed mild scattered signal abnormality within deep white matter but was considered stable.  Watson saw Dr. Hentati again on August 10, complaining that she was more fatigued and that her work performance had diminished as a result.  Dr. Hentati noted impressions of "[f]atigue of unknown cause" and "[b]rain MRI abnormalities [that] remain stable but [are] of unknown cause."  AR 448.  He suggested that Watson obtain a second opinion from the Mayo Clinic.  When Watson visited Dr. Stein on October 4, she continued complaining of fatigue and reported "[m]aking a lot of mistakes at work," being "[v]ery discouraged about fatigue and [the] lack of [a] specific diagnosis," and having "[c]oncern[s] about cognition."  AR 444.  Dr. Stein diagnosed Watson with fatigue and piriformis syndrome, giving her stretches to address the latter.  On January 4, 2013, Dr. Hentati noted "[d]emyelinating disease is [a] consideration but no progression of the abnormalities, and normal spinal tap."  AR 444.  After an e-consult with a physician at the Mayo Clinic, in which the physician agreed with Dr. Hentati's management plan, Watson returned to Dr. Hentati on January 21.  Dr. Hentati noted that Watson reported her symptoms got worse when under stress but that otherwise her fatigue was stable, even with some improvement on her current medication.  Dr. Hentati would not rule out multiple sclerosis as a diagnosis but noted that Watson's stability was "reassuring."  AR 442.

On March 7, Watson saw Dr. Stein, complaining of weakness in her limbs, which required her to stop typing at work, issues with finding words, trembling sensations, fatigue, and difficulty sleeping. Watson also reported being stressed at work and depressed. Watson and Dr. Stein discussed the fact that a multiple sclerosis diagnosis was "far from confirmed," as her "symptoms have been stable" and there had been "no multiple sclerosis defining event as of yet." AR 440. Subsequent laboratory results revealed an elevated creatine kinase level and insufficient levels of Vitamin D. Watson and Dr. Stein agreed during the March 7 visit that Watson should take a leave of absence from her job. Dr. Stein completed a certification under the Family and Medical Leave Act ("FMLA"), stating that Watson could not perform her job due to extreme fatigue, muscle weakness, and poor sleep and would be on leave from March 11 through June 11, 2013. Dr. Stein provided a similar statement to Reliance Standard on March 12 in connection with Watson's application for short-term disability benefits, indicating that Watson suffered from depression, demyelinating disease, and sleep disorder, with the symptoms having begun in November 2007. Dr. Stein estimated that Watson should be able to return to work on June 12, 2013.

In May, Watson began seeing a new primary care physician, Dr. Weisberger, complaining of ongoing depression, lower back pain, intense fatigue, and mild cognitive impairment. Dr. Weisberger diagnosed Watson with major depression. AR 393. Watson also began seeing a therapist, Robert Van Treeck, on June 6. Van Treeck diagnosed Watson with adjustment disorder with mixed anxiety/depressed mood. Van Treeck continued to see Watson for therapy sessions over the next several years. On July 15, Watson again saw Dr. Weisberger, who noted that Watson complained of "[m]uch more pain in the coccygeal area radiating to both butt[o]cks and posterior thighs," which was "[n]ot noticeable when sitting still" but was

exacerbated by any movement. AR 314. Dr. Weisberger instructed Watson to take 600 mg of ibuprofen every six hours as needed for her lower back pain. On July 26, Dr. Weisberger added a muscle relaxant for Watson's back pain because Watson complained that the ibuprofen did not fully manage the pain.

On July 30, Watson was evaluated by another neurologist, Dr. Jesse Taber. Watson did not report any new or worsening symptoms and stated that her pain level at the time was a two. Dr. Taber referred Watson for another sleep evaluation, surmising that she suffered from sleep disruption and may have sleep apnea and narcolepsy. Watson's therapist recorded on August 1 that Watson was frustrated after her visit with Dr. Taber, as she did not have sufficient clinical symptoms to meet the diagnostic criteria for multiple sclerosis and felt as if her doctors were being evasive. Watson expressed a desire to return to work but could not because of her fatigue and pain. She explored alternative work options with Van Treeck, such as opening a small private practice, so as to "adjust [it] according to her energy level," AR 302, or horticulture therapy after completing classes in the field. On August 8, Van Treeck noted Watson reported "difficulty finding words, mild slurred speech approx[imately] daily, and stumbling over words to the point that others notice." AR 302. Watson also described being in a "vice grip of pain" in the mornings from her lower back to her lower thighs, which then continued throughout the day in her joints. AR 302. On August 22, Watson reported feeling discouraged because she felt as if there was "no end in sight," with everything taking longer to accomplish and her not knowing how to treat her symptoms. AR 303.

On September 27, Watson saw Dr. Weisberger, complaining of mid-back pain. Dr. Weisberger referred her for an MRI and prescribed her an additional pain reliever. In January 2014, Watson returned to Dr. Weisberger, not having obtained the MRI or the sleep study that

Dr. Taber had ordered in July 2013.  She reported that her symptoms had stayed consistent, but that she was also suffering from daily migraines causing intense pain in her right neck and right arm, photophobia, and phonophobia.  Although Watson reported "[d]aily fatigue, full body tremor, weakness and tingling in limbs, intermittent numbness in legs, mild forgetfulness, problems with word-finding and pronunciation[,] [i]ntermittent intense pain in legs, thighs and buttocks[,] and [m]oderate joint pain," AR 381, she also reported her pain did not affect her activity level.  On February 6, Watson again saw Dr. Weisberger, complaining of two episodes of vision darkening in her right eye.  Watson also complained that she had grown more fatigued over the previous ten days, but she denied any "change in speech or gait, weakness in any part of [her] body, or difficulty swallowing."  AR 377.  Dr. Weisberger noted that the visual disturbance episodes suggested amaurosis fugax and could be related to migraine prodrome.  On February 14, an MRI of Watson's lumbar spine revealed degenerative changes, particularly at L3-L4.  An April brain MRI showed a "[s]lightly greater prominence of one right inferior frontal nonenhancing juxtacortical white matter lesion" but an "[o]therwise stable pattern of white matter lesion."  AR 579.

Watson continued to experience visual disturbances over the next several months.  On November 24, 2014, she saw Dr. John Pula, a neuro-ophthalmologist, complaining of blurred vision, subjective darkening of her right eye, and dizziness.  On December 5, 2014, Watson saw Dr. Hentati, complaining of vision problems, headaches, increased light sensitivity, fatigue, cognitive difficulties, inability to concentrate or multi-task, general weakness in her limbs, tingling in her calves, and lower back pain.  Dr. Hentati again expressed his opinion that Watson may be suffering from demyelinating disease but stated he could not diagnose multiple sclerosis because there had been no change in her brain lesion.  Visual field examination testing done on

December 9 indicated a decreased foveal threshold in Watson's right eye, possibly indicating macular disease. But visual evoked response testing done on January 26, 2015 returned normal results.

Watson underwent another cervical spine MRI on March 17, 2015, which revealed moderate stenosis of the right half of the spinal canal and noted slight progression of the changes compared to her prior MRI in 2005. On March 27, Watson returned to Dr. Hentati, who noted no cognitive deficits and a negative review of her systems. He again concluded that Watson suffered from "[f]atigue of unknown cause," with a demyelinating disease such as multiple sclerosis a possibility. SAR 325. Dr. Hentati did not diagnose Watson with multiple sclerosis, however, because she had a normal spinal tap and no progression of any brain abnormalities. Although Dr. Hentati noted normal results for her reflexes, motor exam, cranial nerve exam, and sensory exam, only several days later, on March 31, when Dr. Jay Bhatt saw Watson, he found Watson had decreased range of motion on her lower left side and pain in that area. An April 1 brain MRI was stable, with no changes that could be demyelination.

On May 22, Watson returned to Dr. Weisberger, complaining of achiness throughout her body and fatigue throughout the day. Her creatine kinase levels came back elevated. On July 27, Watson saw Dr. Lawrence Layfer, a rheumatologist. Dr. Layfer suspected Watson suffered from fibromyalgia and fatigue based on her reports of "poor sleep, tiredness and diffuse pains." SAR 847.

On February 1, 2016, Dr. Weisberger saw Watson, who noted that although Watson had normal range of motion with no joint enlargement or other tenderness in her upper or lower extremities, she continued to complain of constant pain everywhere. Dr. Weisberger prescribed amitriptyline for the fibromyalgia and Nuvigil for her fatigue, although Nuvigil was not

approved by her insurance.  About a month later, Watson saw Dr. Jennifer R. Bello Kottenstette, an internist, complaining of neck pain.  Watson followed up with Dr. Weisberger on April 1, who suggested changing medications and ordered a shoulder x-ray.  Lab results taken after this visit again showed elevated creatine kinase levels.

On May 6, Dr. Weisberger completed a fibromyalgia residual functional questionnaire. She indicated that Watson met the American Rheumatological Society's criteria for fibromyalgia, with the signs and symptoms including multiple tender points, nonrestorative sleep, severe fatigue, morning stiffness, depression, female urethral syndrome, numbness and tingling, lack of endurance, impaired concentration, and anxiety.  Dr. Weisberger further noted that Watson had pain in the lumbosacral spine, cervical spine, right arm, and bilateral shoulders, hands, fingers, hips, legs, knees, and feet.  She noted that Watson's pain was precipitated by changing weather, stress, heat, cold, and fatigue.  Dr. Weisberger indicated that emotional factors contributed to the severity of Watson's symptoms and functional limitations.  She found a marked limitation in Watson's ability to deal with work stress and that the fatigue and pain frequently impacted Watson's concentration and attention, meaning she could not return to work even in a sedentary occupation on a full-time basis.  Further, Dr. Weisberger opined Watson would need to lie down at unpredictable intervals if she did return to work and would miss work more than three times per month.

On June 7, Watson again saw Dr. Hentati.  He noted her complaints of fatigue and cognitive issues, including difficulties finding words and pronouncing them, in addition to weakness in the limbs, trembling, and stumbling.  Dr. Hentati's examination revealed normal results, however, and he again concluded Watson suffered from "[f]atigue of unknown cause consistent with chronic fatigue syndrome," as well as a potential demyelinating disease.  SAR

34. On July 31, Watson had a brain MRI. The MRI did not show any significant change when compared to her prior MRI, with no evidence of expanding intracranial mass, areas of abnormal enhancement, hemorrhage, or pathologic susceptibility.

In a letter to Watson's counsel sent on August 25, Dr. Weisberger stated that Watson "receives regular care for demyelinating disease of the central nervous system, chronic fatigue syndrome with fibromyalgia, degenerative joint disease of the right shoulder, and degenerative disc disease of the lumbar spine." SAR 38. She noted that Watson could not work because of her "severe fatigue, pain in the cervical spine, lumbar spine, shoulders, hips, legs, knees and feet, morning stiffness and impaired concentration," indicating that her "pain is constant at a moderate level; every several months she has a 2 to 3 week flair of her pain into severe levels." *Id.* Finally, Dr. Weisberger indicated that Watson's symptoms have been resistant to treatment with both antidepressant and analgesic medications.

In her therapy sessions between 2014 and 2016, Watson discussed both how she found gardening therapeutic and how, despite that therapeutic value, she had little energy for gardening because of worsening pain and because it took her a long time to recover from the activity. Other phobias did contribute to her decreased gardening work, however, such as seeing rats in the garden. Watson also reported that she found taking her dog for a walk to be stress-relieving, although she again noted she could not take him for long walks because she became fatigued. She also related that her family situation and concerns about her financial situation drained her energy.

## II.    The Reliance Policy

Watson was covered by a long-term disability policy (the "Policy") issued and administered by Reliance Standard to her employer, Hektoen. The Policy provides that Reliance

10

Standard will pay a monthly benefit to an insured who "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to [Reliance Standard]." AR 20. Under the Policy,

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation;
>
> (1) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
>
> (2) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

AR 12. The Policy limits benefits for Total Disability caused by mental or nervous disorders to twenty-four months unless the insured is in a hospital or institution at the end of the twenty-four month period. The Policy defines mental or nervous disorder to include "disorders which are diagnosed to include a condition such as . . . (5) depressive disorders; (6) anxiety disorders; [and] (7) somatoform disorders (psychosomatic illness)." AR 24.

To the extent Watson satisfies the eligibility requirements under the Policy, she is entitled to a gross benefit of $3,314.77 per month, subject to offsets for federal income taxes and other income benefits, until she reaches 66 years and 10 months of age.

### III.  Long-Term Disability Benefits Determination

After Watson stopped working on March 11, 2013, she submitted an application to Reliance Standard for short-term disability benefits. Reliance Standard approved and paid short-term disability benefits for the maximum period, through June 11, 2013. Following exhaustion

of her short-term disability benefits, Watson's claim rolled over to Reliance Standard's long-term disability benefits department.

Hektoen provided Reliance Standard with Watson's job description. Watson also provided a description of her job duties on her disability claim form, stating them as "supervise research associates, coordinate mental health studies, provide referrals for case [management] resources, [and] maintain participant information." AR 205. John Zurick, a Reliance Standard vocational rehabilitation specialist, completed a vocational analysis using the Dictionary of Occupational Titles ("DOT"), determining that Watson's occupation most closely matched the occupation of "Research Associate" in the industry of "Museums, Art Galleries, and Zoo," DOT Code 109.067-014, and the occupation of "Research Worker, Social Welfare" in the "Professional and Kindred" industry, DOT Code 054.967-010. Both are classified as sedentary positions, mostly involving sitting but also some standing or walking for brief periods of time and occasionally requiring "[l]ifting, [c]arrying, [p]ushing, [and] [p]ulling 10 [l]bs." AR 210, 213. The positions involve work situations where the employee must make judgments and decisions and synthesize data.

In October 2013, Reliance Standard initially determined that Watson did not qualify for long-term disability benefits under the Policy. Watson appealed, but Reliance Standard upheld the denial of the claim. In July 2014, Watson filed this case, seeking payment of long-term disability benefits under ERISA. After hearing oral argument on Watson's initial motion for judgment in June 2015, the Court remanded the case to the claims administrator to conduct additional examinations and further proceedings.

On October 21, 2015, Dr. Robert Hanlon, Ph.D., ABPP, an Associate Professor of Psychiatry and Neurology at Northwestern University Feinberg School of Medicine and a Board

Certified Clinical Neuropsychologist, examined Watson for an independent neuropsychological evaluation ("INE"), as agreed to by the parties in this litigation. Dr. Hanlon opined that Watson "manifests a psychiatric disorder; a nonorganic disorder," revealing "no evidence of cognitive impairment" despite the fact that she made "multiple cognitive complaints." SAR 890–91, 895. He further noted that "given her tendency for somatization, it is extremely likely that some of her physical and cognitive complaints are manifestations of chronic depression." SAR 891. Watson's general intellectual functioning tested in the high average range, revealing no evidence of intellectual decline based on a psychometric-demographic estimate of premorbid intelligence. Dr. Hanlon did not recommend any work restrictions from a neuropsychological perspective but deferred to a physician with respect to medical and physical restrictions.

Based on Dr. Hanlon's INE, Reliance Standard provided Watson with twenty-four months of benefits under the Policy's mental or nervous disorder limitation. Reliance Standard paid Watson these benefits on or about December 28, 2015.

On July 20, 2016, Watson underwent an Independent Medical Examination ("IME") with Dr. Jeffrey Kramer, M.D., who is Board Certified in Neurology and Sleep Medicine. Dr. Kramer did not find "evidence of any neurologic impairment," noting that her "MRI brain findings are nonspecific in nature," that "[s]he does not have a documented sleep disorder," and that "[s]he has a chronic fatigue problem, which again is non-neurologic and may be related to depression." SAR 866. He also did not find evidence of a demyelinating disease, concluding that her primary diagnosis was related to depression. In a supplemental report after receiving updated medical records, including the July 31 brain MRI, Dr. Kramer again noted that Watson suffered from chronic fatigue syndrome. Finally, Dr. Kramer determined that Watson "has full duty work capacity from a neurologic standpoint." SAR 867.

On November 23, 2016, Reliance Standard denied further benefits to Watson, basing its denial on its conclusion that the medical evidence did not establish that Watson suffered from restrictions and limitations solely due to physical conditions separate and distinct from her depression and anxiety so as to render the twenty-four month mental or nervous disorder limitation inapplicable.  Thus, Reliance Standard concluded that, in the absence of psychiatric factors, Watson is not totally disabled from her sedentary occupation beyond June 10, 2015.

## IV.    Social Security Benefits Determination

On March 27, 2014, Watson applied for Social Security Disability Insurance ("SSDI") benefits, alleging a disability onset date of March 11, 2013.  Watson underwent several consultations for the Bureau of Disability Determination Services in connection with her application for SSDI benefits.  On July 14, 2014, Watson had an internal medicine consultative examination with Dr. Roopa Karri.  In the report, Dr. Karri noted Watson had normal grip strength, and that the range of motion in her shoulders, elbows, wrists, hips, knees, and ankles was normal.  Dr. Karri also observed that Watson's cranial nerves were intact, she had normal speech, and her reflexes and sensory perception appeared normal.  Dr. Karri reported impressions of depression with memory problems secondary to a brain lesion, chronic fatigue, pre-diabetes, and hyperlipidemia. That same day, Watson had a psychiatric evaluation with Dr. Henry K. Fine.  Dr. Fine diagnosed Watson as suffering from "[p]ersistent depressive disorder/moderate/ongoing/intermittent major depressive type," with a medical diagnosis of demyelinating disease.  SAR 273.  He also concluded that Watson's mental status was "noncontributory" to her work abilities.  *Id.*

Sometime after March 16, 2015, Watson submitted a Function Report to the Social Security Administration.  She reported that she was limited cognitively, in that she had difficulty

with memory, organization, and was slower at understanding verbal language, among other things. She also claimed physical limits stemming from daily fatigue and generalized body pain, full body tremors, tingling sensations in her legs, blurry vision, and intolerance of extreme weather. She indicated she could not sit for long periods of time, needed multiple rest periods, and had difficulty bending. Finally, she claimed sleep difficulties, including frequent nightmares and night terrors. Watson indicated that her adult daughter helped her cook and finish chores and other tasks she could not do. She did acknowledge she could accomplish most daily chores, with the assistance of many rest breaks, and indicated that she did not have much interest in preparing complicated or involved meals. Watson claimed that, to the extent she did not complete housework, it was because it took more energy than she had. Although Watson continued to read, garden, go out for meals, and undertake other activities, she indicated she did so less than usual and preferred less difficult activities and found herself to be less social than she previously had been. She noted she was slower at math than before, with brain fog affecting her concentration and ability to complete tasks.

On April 13, 2015, Watson's daughter, Elizabeth, completed a third-party Function Report about her mother, indicating that Watson was tired and in pain constantly, had a decreased attention span and seemed to have trouble remembering things. Elizabeth also noted that Watson could not sit for extended periods of time and needed help with the cooking and cleaning, among other tasks. Elizabeth recounted that her mother needed help with gardening because she complained about being too tired and having pain everywhere.

The Social Security Administration denied Watson's SSDI claim through two initial levels of review. On August 7, 2015, Watson requested a hearing, which took place on May 25, 2016 before an Administrative Law Judge ("ALJ"). On July 12, 2016, the ALJ awarded Watson

her requested SSDI benefits. The ALJ found Watson disabled as of March 11, 2013 and that she suffered from the following severe impairments: affective disorder variously diagnosed as adjustment disorder with mixed anxiety and depressed mood or unspecified depressive disorder, anxiety disorder, degenerative disc disease of the lumbar spine, fibromyalgia, chronic fatigue syndrome, and demyelinating cerebral disease. The ALJ concluded that Watson

> has the residual functional capacity to perform a range of sedentary work . . . in that [Watson] can lift up to 10 pounds occasionally; stand or walk for approximately two hours in an eight-hour workday; occasionally climb ladders, ropes or scaffolds; frequently climb ramps or stairs, balance, stoop, crouch, kneel, and crawl; able to perform unskilled or semi-skilled work; and the claimant would be expected to be off-task for more than 20% of the workday due to depression, anxiety, fatigue, and pain.

SAR 72. The ALJ noted that Watson has "consistently complained of an array of debilitating symptoms, including chronic and severe fatigue, constant diffuse pain, migraine headaches, depression, and anxiety." SAR 73. Although Watson "perceives that her cognition has declined significantly," the ALJ acknowledged that "objective testing has repeatedly found no cognitive deficits." *Id.* The ALJ concluded that Watson's "symptoms are consistent with several disorders including fibromyalgia, chronic fatigue syndrome, and somatic symptoms disorder." *Id.* The ALJ did find record evidence of pain, fatigue, and degenerative changes in Watson's lumbar spine. The ALJ concluded that Watson's past relevant work exceeded her residual functional capacity and that her acquired job skills do not transfer to other occupations within her residual functional capacity. Finally, considering her age, education, work experience, and residual functional capacity, the ALJ determined that no jobs existed in significant numbers that Watson could perform, rendering her disabled.

## ANALYSIS

### I. Standard of Review

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Although the Policy here provides that Reliance Standard has discretionary authority, the Court ruled on January 28, 2015 that its review of Watson's claim for long-term disability benefits is *de novo*. *See* Docs. 24 & 30-1. Thus, the Court must decide whether Watson is entitled to the long-term disability benefits she seeks under the Policy, "tak[ing] evidence (if there is a dispute about a material fact) and mak[ing] an independent decision about how the language of the contract applies to those facts." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009); *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). "[W]hether the plan administrator gave the employee a fair hearing or undertook a selective review of the evidence is irrelevant."[2] *Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012).

As the party seeking to obtain benefits under the Policy, Watson has the burden of proving she is entitled to benefits by a preponderance of the evidence. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005); *Curtis v. Hartford Life & Accident Ins. Co.*, 64 F. Supp. 3d 1198, 1212 (N.D. Ill. 2014). The parties disagree, however, on how the burden applies because of Reliance Standard's invocation of the mental or nervous disorder limitation. Watson

---

[2] Thus, to the extent that Watson argues that Reliance Standard's decision was flawed because it failed to provide her with a full and fair hearing or cherry picked evidence, for example, the Court will not address those arguments because they are not relevant to the Court's independent analysis of whether Watson is entitled to benefits under the Policy's terms.

contends that Reliance Standard has the burden to prove that Watson suffers solely from a mental or nervous disorder so as to keep her benefits capped at the twenty-four months she has already received. *See Deal v. Prudential Ins. Co. of Am.*, 263 F. Supp. 2d 1138, 1143 n.2 (N.D. Ill. 2003) ("The burden of proving that a claim falls within an exclusion rests squarely on the insurer." (quoting *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995))); *see also Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 609 (6th Cir. 2016) ("Reliance bears the burden to show that the exclusion on which it based denial of benefits, the Mental and Nervous Disorder Limitation, applies in this case."). Reliance Standard, on the other hand, argues that to receive additional benefits, Watson must demonstrate that she cannot perform the material and substantial duties of her regular occupation solely because of the symptoms of her physical conditions. *See Doe v. Prudential Ins. Co. of Am.*, 215 F. Supp. 3d 942, 949 (C.D. Cal. 2016) (finding that because twenty-four month mental health limitation does not operate to totally deny coverage, the plaintiff bears the burden of proof on the application of the limitation); *Ringwald v. Prudential Ins. Co. of Am.*, 754 F. Supp. 2d 1047, 1057 (E.D. Mo. 2010) ("After 24 months of benefits have been paid, the burden rests with the Plan participant to establish entitlement to continued benefits by proving both that he is unable to perform the duties of any gainful employment and that his disability is not due in whole or part to mental illness."). Some courts, including the First Circuit, have found it unnecessary to resolve who bears the burden, noting that where "the burden of proof is the preponderance of the evidence standard, how the burden is allocated does not much matter unless one or both parties fail to produce evidence, or the evidence presented by both sides is in 'perfect equipoise.'" *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 83 (1st Cir. 2010) (quoting *LPP Mortg., Ltd. v. Sugarman*, 565 F.3d 28, 33 (1st Cir. 2009)); *see also Jarillo v. Reliance Standard Life Ins. Co.*, No. 15cv2677-

MMA(BLM), 2017 WL 1400006, at *10 (S.D. Cal. Apr. 19, 2017) (finding that the court need not determine who bore the burden of proving whether plaintiff's disability was subject to the mental disorder limitation because plaintiff prevailed regardless).

The Court finds it similarly unnecessary to resolve the issue here. The Court's task at this stage is to determine whether Watson remains totally disabled based on her physical limitations, or, in other words, if her physical symptoms render her disabled regardless of her mental condition. *See Krolnik*, 570 F.3d at 844. As the Court details further below, the record reflects that Watson cannot perform her occupation based on her physical limitations, a conclusion the Court would draw whether the burden rested with either party.

## II.    Scope of Watson's "Regular Occupation"

To determine whether Watson is entitled to benefits—if she is "totally disabled"—the Court must first determine the "material duties of [Watson's] regular occupation." AR 12. Reliance Standard defined Watson's occupation as a sedentary position, considering only whether she had the physical capacity to perform sedentary work in denying her further benefits instead of, as Watson argues, considering the actual specific material job duties of Watson's occupation. *See* SAR 7 (in its final denial of benefits letter, stating that "it is apparent that, in the absence of any psychiatric factors, Ms. Watson retains the physical capacity to perform sedentary work, on a full-time and consistent basis"). Watson has not spent much time in this round of briefing developing this argument but appears to take issue with the fact that Reliance Standard ignored the non-exertional aspects of Watson's job, such as the need for Watson to be a reliable worker and be able to remain seated for long periods of time. The Court agrees that it should consider Watson's ability to perform all aspects—the physical and non-physical—of her regular occupation. *See, e.g.*, *Cheney v. Standard Ins. Co.*, No. 13 C 4269, 2014 WL 4259861, at

*11 (N.D. Ill. Aug. 28, 2014) (noting that the "non-examining doctors relied on by Standard, who found plaintiff capable of general sedentary work, failed to opine on plaintiff's non-exertional limitations and how those would affect her ability to perform the high-stress work of a litigation partner. We can say in relying on the non-examining doctors, Standard 'glossed over' the issue of plaintiff's need to concentrate and perform the 'mental demands of the active practice of law.'"); *Bregman v. Hartford Life & Accident Ins. Co.*, No. 3:04-cv-1657 (CFD), 2008 WL 4371927, at *9 (D. Conn. Sept. 23, 2008) ("The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity.").

### III.   Watson's Ability to Perform the Material Duties of Her Regular Occupation

For the Court to find Watson "totally disabled," she must be unable to "perform the material duties of his/her regular occupation." AR 12. Although not discussed in detail by the parties, this language covers both qualitative and quantitative reductions in Watson's ability to perform the material duties of her occupation. *McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 588 (7th Cir. 1998); *Cheney*, 2014 WL 4259861, at *12 ("Following the guidance of *McFarland*, qualitative and quantitative reductions in plaintiff's performance are equal to an inability to perform 'the material and substantial duties' of her job."). A qualitative reduction is one where the claimant is unable to perform even "one core and essential aspect of [her] job" so as to result in the loss of her position even if the duty comprised only 5% of the claimant's duties. *McFarland*, 149 F.3d at 588. A quantitative reduction, on the other hand, is one "in which the injury or sickness would not physically prevent an employee from performing any

given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation." *Id.*

The parties dispute Watson's medical symptoms and their effects on her ability to perform her job. Watson contends that her medical records demonstrate that she suffers from chronic fatigue syndrome, fibromyalgia, cervical and lumbar spinal pain, and migraines. Watson generally contends that the resulting pain and fatigue frequently impair her attention, concentration, and ability to handle stress, require her to lie down at unpredictable times and take breaks from tasks, and would require her to miss at least three days of work per month. Watson claims the evidence indicates she could not sit for long periods of time, would have difficulty performing her job reliably, and could not physically be a consistent presence at her job. Reliance Standard, on the other hand, highlights the fact that Watson has consistently been diagnosed with and treated for anxiety and depression, with both the INE and IME concluding that she did not exhibit any cognitive impairments or other disabling conditions that would make her unable to physically perform the material duties of her regular occupation. Reliance Standard also focuses on the fact that Watson's treating physicians documented normal physical and neurological examinations without imposing restrictions or limitations on her activity.

Having reviewed the entirety of the record and considered the parties' arguments, the Court finds that despite some conflicting evidence, the preponderance of the evidence suggests that Watson cannot perform the material duties of her regular occupation due to the physical symptoms of her diagnosed medical conditions. As Watson argues, her own description of symptoms, past examination findings, objective test results, and medical history demonstrate that she suffers from fibromyalgia, chronic fatigue syndrome, spinal stenosis, and migraines. Although Reliance Standard admits that the record includes Watson's own self-reported

complaints of fatigue, weakness, numbness, and pain, Watson's evidence goes beyond mere self-reported complaints of pain and fatigue. Her treating physicians have now diagnosed her with, among other illnesses, chronic fatigue syndrome and fibromyalgia, for which "the crucial symptoms, pain and fatigue, won't appear on laboratory tests." *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1139 (7th Cir. 2017). Even Dr. Kramer acknowledged that she suffers from chronic fatigue syndrome. Nothing in the record undermines her fibromyalgia diagnosis or suggests that those symptoms are exaggerated.[3] Dr. Weisberger completed a fibromyalgia residual functional questionnaire in May 2016 in which she indicated that Watson satisfied the criteria for diagnosing fibromyalgia, noting that Watson had multiple tender points, nonrestorative sleep, severe fatigue, morning stiffness, depression, female urethral syndrome, numbness and tingling, lack of endurance, impaired concentration, and anxiety.

But the Court cannot just stop at Watson's diagnoses, as the Court must consider "how much an individual's degree of pain or fatigue limits his functional capabilities." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). Although courts have found functional capacity evaluations helpful in determining the extent to which an individual's pain or fatigue limits her ability to perform her occupation, *see Warner v. Unum Life Ins. Co.*, No. 12 C 02782, 2014 WL 7497233, at *8 (N.D. Ill. Dec. 31, 2014) (collecting cases), no such evaluation

---

[3] The record is unclear as to whether Dr. Weisberger performed a trigger point test on Watson, traditionally used to diagnose fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996) (noting that "the only symptom that discriminates between [fibromyalgia] and other diseases of a rheumatic character [are] multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch"). But the trigger point test is no longer the only test used to diagnose fibromyalgia. The Social Security Administration's guidance on fibromyalgia, SSR 12-2p, sets forth two tests used to establish fibromyalgia, with an alternative option to the trigger point test looking at whether the patient shows repeated manifestations of certain symptoms, signs, and co-occurring conditions, such as fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, and irritable bowel syndrome. Dr. Weisberger's completed residual functional questionnaire indicates that Watson meets the American Rheumatological Society's criteria for fibromyalgia but does not specify which test she used to determine this diagnosis.

occurred in this case.  Instead, the Court is left with Watson's self-reports of her ability to work, the opinions of Watson's treating physicians, the IME and INE, and the ALJ's decision.

Reliance Standard argues that the evidence in the record suggests that Watson is capable of performing sedentary work.  It points, for example, to Watson's visits with doctors where she reports that she is not in pain or where doctors document that she has normal range of motion, full strength, and no enlargement of her joints.  The Court must not look at Watson's medical records in isolation, however, and instead should assess them as a whole to determine if she is unable to perform the duties of her occupation.  *See Curtis*, 64 F. Supp. 3d at 1213 ("The Court must consider the combined effect of Curtis's physical impairments, cognitive impairments, and ability to perform 'any occupation' as defined by the Plan in making its disability determination, so whether or not one particular doctor explicitly stated Curtis was 'disabled from any occupation' is not dispositive.").  Just as Reliance Standard points to examples of normal reports, the Court could also find other visits where Watson reported pain, weakness, and decreased range of motion.  Moreover, the fact that Watson may have been able to perform some daily activities or did not always complain of pain is not disqualifying; "the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p.  Similarly, Reliance Standard's focus on reports of normal range of motion and lack of swelling is misguided.  *See Sarchet*, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").

Reliance Standard also points to Watson's own reports that she can engage in daily activities, but in the Function Report Watson submitted to the Social Security Administration,

she emphasized she needed to take frequent breaks, did not engage in these activities as often as she previously did, and needed help to the extent she did.  Watson also made similar complaints to her therapist and her daughter agreed with this assessment.  Finally, Reliance Standard relies on the IME and INE, both of which found that she did not have any cognitive or neurological impairments preventing her from working full-time.  But Dr. Kramer, who performed the IME, acknowledged that Watson suffers from chronic fatigue syndrome and only concluded that Watson had full duty work capacity from a neurologic standpoint, omitting any conclusions about her physical capabilities.  And Dr. Hanlon, the neuropsychologist who performed the INE, deferred to Watson's treating physician concerning medical and physical restrictions.  Thus, these reports do not rule out or shed any light on whether Watson's fibromyalgia, chronic fatigue syndrome, and other physical symptoms render her unable to perform the material duties of her occupation.

Dr. Weisberger, on the other hand, opined that, based on Watson's physical symptoms and particularly her fatigue and difficulty concentrating, Watson could not work in a sedentary occupation.  Although the Court is not required to defer to Watson's treating physicians, it finds it appropriate to give weight to those physicians' subjective judgments of Watson's limitations "given the subjective nature of [chronic fatigue syndrome and fibromyalgia], the fact that its symptoms are sporadical inasmuch as they fluctuate in frequency and severity, and the fact that it can exist even though physical examinations may be within normal limits."  *Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 946 (D. Az. 2010) (noting as well that "the consistent diagnosis of [chronic fatigue syndrome] by [plaintiff's] physicians and consistent observations of the manifestations of her impairments by those physicians can be viewed as objective medical evidence of her condition").  The Court finds this to be particularly true here

where Reliance Standard did not pursue a functional capacity examination or an independent medical evaluation with a rheumatologist.

Finally, the ALJ's disability finding, although not binding on Reliance Standard under ERISA, supports the conclusion that Watson's physical disabilities prevent her from performing her occupation. *See Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) ("SSA determinations are often instructive, but they are not determinative."); *Krolnik*, 570 F.3d at 844 ("[A] finding of disability under the Social Security program need not imply disability for any other purpose."). The ALJ, in granting Watson SSDI benefits, found that Watson's impairments, including fibromyalgia, chronic fatigue syndrome, degenerative disc disease of the lumbar spine, and demyelinating cerebral disease, render her disabled. Reliance Standard reads the ALJ's decision as support for its argument that Watson suffers primarily from a psychiatric condition, pointing out that the ALJ noted that objective testing had found no cognitive deficits and that Watson had been diagnosed with fibromyalgia, chronic fatigue syndrome, and somatic symptoms disorder, with the last qualifying under Reliance Standard's mental or nervous disorder limitation. Reliance Standard also highlights that the ALJ recounted Watson's treatment with antidepressant and antianxiety medication. According to Reliance Standard, these findings support Reliance Standard's determination that when Watson's physical conditions are looked at in isolation, she retains the capacity to return to a sedentary job. But the Court does not find Reliance Standard's reading of the ALJ's decision plausible. The ALJ did not list somatic symptom disorder as a severe impairment but did find fibromyalgia and chronic fatigue syndrome to be so. The ALJ noted specific evidence concerning her physical limitations, including that provided by her treating physician, Dr. Weisberger, and found Dr. Weisberger's opinion to be "consistent with her treatment notes, the treatment received, and the claimant's

reports." SAR 75. The ALJ also conducted a vocational analysis, finding Watson's work history to suggest that "she would be working if she were able to do so." SAR 74. This analysis supports the Court's conclusion that Watson remains totally disabled based on her physical limitations. As a result, Watson is entitled to long-term disability benefits under the Policy, dating back to June 10, 2015.

## IV.     Prejudgment Interest, Attorneys' Fees, and Costs

Having found that Watson is entitled to long-term disability benefits, a presumption arises in favor of prejudgment interest, which typically accrues from the date of loss or the date on which the claim accrued. *Curtis*, 64 F. Supp. 3d at 1224. The interest is usually compound. *Id.* Seeing no reason to avoid applying the presumption in favor of prejudgment interest, the Court awards Watson prejudgment interest compounded monthly from June 10, 2015 to the present.

Watson also requests attorneys' fees and costs, but the parties have not addressed the issue in their briefing. The Court orders the parties to meet and confer and submit a proposed order to the Court with an agreed calculation of Watson's attorneys' fees and costs. If the parties cannot come to an agreement, the parties shall submit an agreed briefing schedule and follow the procedure set forth in Northern District of Illinois Local Rule 54.3.

## CONCLUSION

For the foregoing reasons, the Court grants Watson's motion for entry of judgment [61] and enters judgment in favor of Watson and against Reliance Standard. Watson is entitled to monthly payments due under the terms of the Policy, as well as all back payments, plus prejudgment interest, compounded and retroactive to June 10, 2015. The parties shall meet and confer and submit a proposed judgment order to the Court consistent with this Opinion and

Order containing an appropriate calculation of Watson's past due benefits, prejudgment interest, and attorneys' fees and costs by December 1, 2017.  If the parties cannot come to an agreement concerning attorneys' fees and costs, they shall submit a proposed briefing schedule on the issue by the same date.

Dated: November 14, 2017

_____
SARA L. ELLIS
United States District Judge